## 26535. CAUSEY *v.* SWIFT & COMPANY.

DECIDED MARCH 18, 1938.

*Edward F. Taylor, Wilson & Vandiver,* for plaintiff.
*Joseph W. Popper,* for defendant.

STEPHENS, P. J. Mrs. Hattie B. Causey sued Swift & Company, a corporation, to recover damages for personal injuries alleged to have been received by her on or about May 22, 1936, as a result of a collision in the City of Macon, Georgia, at the intersection of Montpelier and Coleman Avenues, between an automobile in which she was traveling and an automobile truck belonging to the defendant which, at the time, was being negligently operated by the defendant by and through its servant, the driver of the truck, E. P. Meadows. The defendant in its plea denied liability. On the trial of the case the court directed a verdict for the defendant. The plaintiff moved for a new trial on the general grounds, and on the sole special ground that the court erred in directing a verdict. To the judgment overruling the motion for new trial the plaintiff excepted. The sole question presented for determination is whether, under the undisputed and uncontradicted testimony, the inference was demanded that at the time of the collision the de-

fendant's truck, which was being operated by its servant and driver, was being operated by the servant while on a mission of his own, and was not at the time in the prosecution of and in the scope of his master's business. The evidence otherwise was sufficient to authorize a finding that the plaintiff received personal injuries as a result of the negligence of the driver in the operation of the defendant's truck. It appeared from the evidence that at the time of the occurrence complained of the defendant Swift & Company was engaged in the manufacture of ice cream in the City of Macon, and operated trucks throughout the surrounding territory by drivers employed by it, one of whom was E. P. Meadows, to make delivery of the defendant's product to its customers. It appeared without contradiction that at the time the defendant had rules and regulations which prevented its employees, including its drivers, from using its trucks for their private business, or on any business other than the business of the corporation, and that these rules and regulations were known to Meadows; that on the afternoon of the day on which the accident occurred Meadows left the plant of the defendant in one of its trucks which he was driving on a mission for the defendant, the specific object of the trip being to go to the post office and come back by the laundry; that before leaving, Meadows inquired of his superior at the plant, Mr. Smith, for permission to get his supper while on the trip. As to this Meadows testified that Mr. Smith replied that if Meadows "had an order uptown" he could "stop by somewhere and get a sandwich or something to eat."

Mr. Smith testified, with reference to this, as follows: "I had a conversation with Mr. Meadows and gave him instructions about the use of the truck. Mr. Meadows said something to me about getting supper. I told him the employees were not allowed to use the truck except for business. Mr. Meadows asked me how he was to get his supper, and I told him it would be perfectly all right to stay uptown and get supper but not to go home. His job was to take the mail every afternoon and drive from the post office to the laundry. It all could have been done on the same delivery; naturally he went to take the mail and get the laundry on the same trip. After he got the laundry he was to come back and get out all the orders. On that particular afternoon he was supposed to come back and help me get out all the orders in the ship-

ping department. I did not tell Mr. Meadows that day to go get the laundry and go home and get his supper and come back. I am sure I didn't tell him then. I haven't any more right to use one of their trucks for personal business than Mr. Meadows. . . I told him he could stop uptown and get his supper at a sandwich shop. I didn't tell him which one to get it from. He had to eat wherever the truck went. He didn't tell me where he ate. I authorized him to eat anywhere uptown he wanted to when he was out on a delivery. It was his business to get his supper provided he got it uptown somewhere. When he went out on business for the company he could use that truck and get his supper uptown and that was not part of the company's business. . . If I sent him uptown it was all right for him to eat. I couldn't tell you why they allowed that. His only instructions were not to take the truck on personal business. Of course a man has got to eat in order to do heavy work. He did not exactly have supper hour; didn't have any regular hours at all. He would have long enough off for supper to go and eat—supposed to have an hour. Sometimes it would take an hour, sometimes it didn't take an hour. If he took less than an hour he came back and went to work, and when he got back to work he was carrying on the company's business. The quicker he got through the quicker he could go home if he didn't take but thirty minutes." It appears from the testimony of Mr. Innis, the defendant's manager, that Mr. Waters and Mr. Bein were superior to Meadows, and had authority to give orders to Meadows during the time of his employment; that Mr. Smith was placed in charge of the plant at night after Mr. Bein had gone off duty; that when Mr. Bein was not there Mr. Smith was superior to Meadows at night; that Mr. Bein and Mr. Waters and Mr. Innis "were the only men in the organization that had any right to give any orders or instructions to Meadows." Mr. Waters testified that he was employed by the defendant during the month of May, 1936; that he was in the accounting department and handled orders that "come in and go out;" that he had never given Meadows any instructions about the use of "this truck." Mr. Bein testified that during May, 1936, he was employed by the defendant as foreman of the defendant's plant; that on May 18, 1936 (which was four days before the accident), Mr. Meadows entered the employ of the defendant; that witness

outlined to Meadows some of his duties; that he instructed Meadows that Meadows "was not to use the trucks for going home to supper; that if he went uptown to deliver ice cream and there was a sandwich shop on his way, and he wanted to get something to eat, it would be satisfactory to get something."

It appears from the uncontradicted and undisputed evidence that Meadows left the defendant's plant with the defendant's truck on a mission for the defendant; that he went by the post office, and from there went by the laundry and got some laundry work which he placed in the truck; and that in all this he was acting as a servant of the defendant in the prosecution of the defendant's business and in the scope of his authority as such servant. It appears further from the undisputed and uncontradicted evidence that after Meadows went by the laundry he started in the truck for his home, which was off the return route, for the purpose of going home to get his supper; that in so doing he was going in an entirely opposite direction from the direction of the defendant's plant, and that Meadows, while driving the truck towards his home, and when he reached the intersection of Montpelier and Coleman Avenues, the truck he was driving collided with an automobile in which the plaintiff was riding, and as a result of this collision the plaintiff received physical injuries.

Meadows testified: "At that time I lived at 402 Winship Street; that is west from where the accident happened. That is further out on the Columbus road from there—Montpelier Avenue instead of Columbus road. I didn't have permission from any one at Swift & Company's plant to go to my house and get my supper. Swift & Company's plant is located on Fifth and Plum Streets, and the Independent Laundry is on Second Street. In going from the Independent Laundry to Swift & Company you would go down Poplar to Broadway, up Broadway to Plum, and down Plum until you get to the corner of Fifth and Plum, and that is where Swift's creamery is. I was going in an entirely opposite direction from that. Mr. Bein is one of my bosses; he is the superintendent of the ice-cream department. I had instructions from him about meals; he gave me the same ones Mr. Smith gave me. . . After I had gotten the laundry on the night of May 22nd, I was supposed to come back to the plant and start getting up another shipment. After I got the laundry I headed for home to get some-

thing to eat. I think I went up Cotton Avenue to College, out College and around Tatnall Square." Mr. Waters testified that when he worked for Swift & Company in 1935, the rules as to the use of the trucks were the same as they were in 1936; that he had used the company's trucks to go home in, that the manager had authority to use the company's trucks, that the manager drove the company's car. Mr. Bennett testified that he had worked for the defendant; that Mr. Innis, the present manager, was manager when he was laid off; that after he was laid off Mr. Innis told him that he had seen the truck at his house; that Mr. Innis had never made any complaint about it; that he did not tell witness how many times he had seen it; that Mr. Watson who was superintendent of the plant had at one time been sent home in one of the defendant's trucks; that witness had taken Mr. Watson home himself; that the superintendent himself gave orders for the witness to take Mr. Watson home, and to come back and get him and bring him back to the plant; that this happened a number of times; that Mr. Innis, the manager, had told witness that he had seen the truck at the witness's house while the witness was eating supper. It appeared that just after the accident Mr. Meadows stated: "They told me to get the laundry, get my supper and hurry back." Other than as above indicated there was no evidence whatsoever which would indicate the location of the place where the accident occurred, or its distance from the line of Meadows's route returning from the laundry to the defendant's plant.

It is true that it has been held that where a servant steps aside from his master's business, for however short a time, to do an act entirely disconnected from it, the servant is not in the prosecution of the master's business, and if injury results from the act of the servant the master is not liable. *Fielder* v. *Davison,* 139 *Ga.* 509 (77 S. E. 618); *Savannah Electric Co.* v. *Hodges,* 6 *Ga. App.* 470 (65 S. E. 322); *Dawson Chevrolet Co.* v. *Ford,* 47 *Ga. App.* 312 (170 S. E. 306). In such cases the servant is in the performance of an act entirely disconnected with the master's business, and one which is not authorized by the master to be performed by the servant in the conduct of the master's business. In the case at bar it appears clearly and unequivocally from the undisputed evidence that the servant, Meadows, who was operating the defendant's truck, was authorized by the master, while on the trip

in question, to get his supper. It is essential to the fitness of a workman in the performance of his regular duties that he be properly fed. It appears from the testimony of one of the witnesses in this case, testifying with reference to Meadows's act in getting his supper, that it was necessary for workmen to be fed in order to do heavy work. It was therefore beneficial to the defendant that Meadows should have obtained his supper while on the trip. It was therefore one of the objects of the trip, with the approval and consent of the defendant, that the driver, Meadows, obtain his supper. In *Limerick* v. *Roberts, 32 Ga. App.* 755 (124 S. E. 806), this court approved as a correct statement of the law a charge to the jury that "if a servant or employee, while engaged in the business of his master, makes a slight deviation for ends of his own, the master remains liable when the act was so closely connected with the master's affairs that, though the servant may derive some benefit from it, it may nevertheless fairly be regarded as within the course of his employment." It was therefore within the scope of Meadows's employment for him to use the truck on the occasion in question for the purpose of getting his supper, unless in so doing he made such a territorial digression from the territorial area for the operation of the truck as authorized by the master, as would constitute a deviation from the master's business.

A slight territorial detour by Meadows from the authorized area for the operation of the truck, for the purpose of performing one of the duties which he was authorized by the master to perform on the trip, namely, getting his supper, would not necessarily constitute a deviation from the master's business. The rule is well stated in the American Law Institute's Restatement of the Law of Agency, § 234 as follows: "One may be a servant, although a bad servant, in performing his master's business at a forbidden place if the place is within the general territory in which the servant is employed. One engaged to drive an automobile in New York City would not be in the service while driving in Albany; but a servant directed to drive from New York to Albany on the west side of the Hudson would not cease to be acting within the scope of the employment while driving on the east side. In all cases, it is a question of degree whether or not the difference in place is so great as to make the act done substantially different from

the act authorized. If the driving is an independent journey as distinguished from a mere detour, the servant is upon an enterprise of his own and the master is not liable for his conduct during the trip. . . Where the area within which the servant is to act is very limited, a slight departure from it may be effective to remove the act from the scope of employment although, if the employment covered a larger area, a greater departure would not." Therefore if Meadows made a slight detour for the purpose of getting his supper he was not necessarily and as a matter of law, in so doing, acting beyond the scope of his employment.

There is absolutely no evidence in this record which shows with any degree of certainty how far Meadows had made a territorial detour from the territorial area of the truck's operation. It may have been a block, or it may have been two blocks. The evidence tending most strongly to show that Meadows had deviated territorially from his authorized route is in his testimony. He stated that he was "going in an entirely opposite direction" from the route back to the defendant's plant. It appears from the evidence that the accident happened at the intersection of Montpelier and Coleman Avenues, and near Tatnall Square. There is nothing in the evidence to indicate the location of these places. While it appears from the evidence that Meadows was going to his home at 402 Winship Street, the location of 402 Winship Street nowhere appears from the evidence. So far as it appears from the evidence, the intersection of the streets where the accident occurred, or Tatnall Square, or Meadows's home to which he was proceeding, may have been in close proximity to the route by which he was required by the defendant to return with the truck to the plant. It was held in *Perry* v. *Lott*, 38 *Ga. App.* 729 (145 S. E. 479), that where there was no evidence as to what route was pursued by the driver, whether there was a slight or a gross deviation from the direct route which it was his duty to travel, it could not be said as a matter of law that the driver had made such a deviation as took him without the scope of his employment. The court can not take judicial notice of the locality of streets or squares in a city, or the distance between various streets in a city. These are not "matters of public knowledge" which can be "judicially recognized without the introduction of proof." Code, § 38-112; North

Chicago Street R. Co. *v.* Cheetham, 58 Ill. App. 318; People *v.* Wilkerson, 162 Ill. App. 76; Anderson *v.* Ocala, 67 Fla. 204 (64 So. 775, 52 L. R. A. 287). See *Avera* v. *State,* 25 *Ga. App.* 276 (2) (103 S. E. 94).

The evidence did not, as a matter of law, demand a verdict for the defendant. The court erred in directing a verdict for the defendant, and in overruling the plaintiff's motion for new trial.

*Judgment reversed. Felton, J., concurs. Sutton, J., dissents.*