## 34689. BAILEY v. MURRAY.

DECIDED JUNE 18, 1953—REHEARING DENIED JULY 2, 1953.

*Irwin & Dyer, Osgood Williams, Lester B. Dixon,* for plaintiff in error.

*Nall, Sterne & Miller,* contra.

TOWNSEND, J. The sole issue in this case is whether the court erred in granting a nonsuit on the theory that at the time of the injuries complained of the employee was upon his own personal business and was not acting within the scope of his employment. On considering whether the grant of a nonsuit is error, the evidence is construed in favor of the plaintiff; and, if the plaintiff makes out a prima facie case, and it is sufficient, with inferences fairly drawn therefrom, to support his position, such evidence, even though slight, is sufficient to take the case

.to a jury. *Ellison* v. *Evans,* 85 *Ga. App.* 292 (69 S. E. 2d 94);
*Brown* v. *Savannah Electric & Power Co.,* 46 *Ga. App.* 393 (167
S. E. 773). The evidence is undisputed that the driver of the
truck, Napoleon Bracy, and three others, one of whom was
Robert Rivers, were employed by the defendant on a piece-work
basis to cut and haul timber over a fairly wide´ area in the
vicinity of Jonesboro, Georgia; that the truck was ordinarily
driven by one of these employees, who took it home at night,
and in the morning picked up the other three and went to the
place where the timber was to be cut (the defendant's conten-
tion being that only Rivers had authority to drive or keep the
truck, while the plaintiff contended that all the employees, and
especially Bracy, shared this authority); that three of the em-
ployees lived about three miles from Jonesboro, and the other,
Rivers, lived within that town; that the place where the timber
was to be cut that morning was eight or nine miles from Jones-
boro, in an easterly or northeasterly direction; that Bracy had,
on the previous Sunday night, driven the truck to Forest Park,
where he spent the night visiting friends, and that he started
back to Jonesboro about 4:30 Monday morning for the purpose
of picking up Rivers and the other employees and carrying them
to where the timber was being cut; that the collision occurred on
a curve just outside the city limits of Forest Park; and that it
.was due to Bracy's failure to have the truck under control, and
resulted in the plaintiff's injuries.

The defendant testified that he had given Rivers permission
to drive the truck; that he had not given Bracy such permission,
and did not know that he drove it; that the men were their own
bosses to a large extent, had no particular time to be at the
woods, but commenced work from 5 to 8 a.m.; that they would·
usually go to work about 7, sometimes earlier. Bracy testified
·in part as follows: "It was Mr. J. M. Murray's truck. He
knew me and Robert and the others were driving this particular
truck at various times. On the week-end before Mr. Murray
let me have the truck at my house, until that Sunday evening
I taken it up to Robert's house. . . We went down to Mr.
Murray's house the Saturday before that week-end, and we
got some gas. He saw me driving the truck there at the time.
He did not make any objections to my driving the truck, he

never had. Robert had a truck, so I kept this particular truck that was involved in this accident more or as much as Robert did. . . At the time I had this collision with Mrs. Bailey I was headed to pick up Robert and the other boys to go to work. . . We did not have any certain time to load this pulpwood. We usually started early in the morning. . . As to whether there was any particular route we went over to pick up the boys to go to work in the woods, whether we would just go where we thought the route was more convenient to us, we would go the convenient way. There wasn't any particular route. . . [Mr. Murray] turned his truck over to another group of haulers and cutters on another truck. He came around and actually saw me driving the truck on the job. I disremember how many times, but he would come by right regularly and see me driving the truck. . . He told me to use the truck in the morning, to pick up pulpwood cutters and bring them to work. That was the only way we had to get to work. Mr. Murray knowed the hauler, Robert Rivers, had rheumatism and couldn't drive the truck very well. As to whether I would go down to get the gas with Rivers at Mr. Murray's house, sometimes I would go with him, and sometimes he would go alone, and sometimes I would go alone. . . We would pick everybody up the next Monday morning coming to work. I was actually doing that at the time I ran into Mrs. Bailey. I was on my way from my friend's house coming directly on to pick up the boys to go to work. . . [Mr. Murray] had given Robert permission to let us use the truck. I was present when that was done, I was listening. . . Robert asked him when this conversation took place, Robert asked him just like on week-ends can we visit friends or go to a show for pleasure and he told him we could. . . I was at Mr. Murray's house where I got the gas for the truck and Robert Rivers asked him in my presence if we could use the truck to go to a movie, and Mr. Murray said, 'Yes, and go to see your friends and the movies, and not to frolic.' . . Mr. Murray never complained whether I drove the truck or Robert, or the cutters, to my knowledge. He saw me fill the gas tank up in his yard and drive the truck away. I drove the truck to Mr. Murray's and got eggs, driving the truck." This testimony was corroborated by that of Robert

Rivers, who testified in part: "[Mr. Murray] put gas in the truck at his pump when Napoleon was driving the truck. . . We both worked on the same truck. He drove the truck sometimes and I would drive it sometimes. Mr. Murray knew he drove the truck, he had saw him drive it. Napoleon drove the truck in the woods where we were getting out pulpwood. Mr. Murray was with us all out there when he was driving the truck in the woods. . . He would drive some and I would drive some. I was employed as head driver. He was helping me out some. I was sick at the time with the rheumatism." He further testified: "Mr. Murray permitted me to take his truck home with me at night. He always permitted me to take it, me sometimes and sometimes the rest of the boys would." He testified that on the night preceding the collision he had taken the truck home and then loaned it to Bracy on the understanding that Bracy would pick up Rivers and the others and carry them to work the following morning.

H. C. Mayo, deputy sheriff, testified: "As to whether or not I heard Mr. Murray make a statement about whether or not he allowed his employees to use his truck, he was talking to Mr. Walker. I was present at the police station in Jonesboro, and he said he let the boys have the truck in order to keep hands because they were hard to get." On cross-examination he stated: "I did not hear Mr. Murray say in that same conversation that this boy wasn't supposed to have the truck, that Rivers was the one in charge of the truck and he didn't know this particular boy had the truck. He told us this same boy had the truck. He just said he was driving the truck, but he didn't know he had it out that late." Lloyd Dixon, sheriff, testified, that he had on several occasions seen colored employees driving the defendant's trucks, had seen them parked at the employees' homes, and had also seen them up around Hapeville with them on Saturdays and Sundays.

It appears from the evidence without dispute that the defendant allowed one of his employees, Rivers, to keep the truck at his place on nights and week-ends and use the same for the convenience of himself and other employees, and that this was a facility to the defendant in that the truck would be used the following morning to pick up employees and take them to their

place of work. However, the evidence is in dispute as to whether the defendant had given Bracy permission to use the truck, or knew that he was driving it. On the question of whether or not Bracy had permission to drive the truck at all, a jury question was presented. On the further question of whether or not a general permission had been extended to the employees to use the truck during leisure hours for purely personal affairs such as visits to friends, an inference would also have been authorized by the testimony of Bracy, Rivers, Mayo, and Dixon that such permission had been extended. The evidence is undisputed that at the time of the collision Bracy was on his way from Forest Park, having spent the night with a friend there, approximately eight, miles from Jonesboro where both he and Rivers lived and where the truck would ordinarily have been kept over night, to pick up his fellow employees and haul pulpwood. The question for determination therefore is whether sufficient facts were established by the plaintiff to authorize a jury to find that Bracy was at the time of the collision acting in the course of his employment, or whether such facts demand the conclusion that he was at that time on his personal mission of visiting his friend in Forest Park.

The plaintiff here relies upon the case of *Davies* v. *Hearn*, 45 *Ga. App.* 276 (2). (164 S. E. 273), which holds that one who has permission, for the convenience of his employer as well as himself, to take a truck which he used for his master's business home with him at night, in order to have it on hand to begin his trips the following day, and who has, with the permission of the master, used the truck for personal business and has then started home with the truck for the night, and has a collision while on the way home, and having so far returned that the point of collision is upon the same route which the employee would normally have followed between the mill and his home, is as a matter of law using the truck within the course of his employment as a servant of the defendant. It is contended by the defendant that this principle cannot apply where, under like circumstances, the defendant's employee has not yet returned to some point on the route which he would customarily have followed had his personal business not intervened; and that, although in the present case Bracy was on his way to pick up his

fellow-employees to take them to work, he had not yet reached the point from which he would have begun this duty if he had not gone to Forest Park on personal business in the first instance. It is recognized that, in the absence of special circumstances, "a servant in going to and from his work in an automobile acts only for his own purposes and not for those of his employer" (*Stenger* v. *Mitchell*, 70 *Ga. App.* 563, 28 S. E. 2d 885, and citations), but, under the authority of the *Davies* case, this rule would not apply where the vehicle is taken to the employee's home because the employee's possession of it enables him more conveniently to perform some duty for the master. See also, in this connection, *Lewis* v. *Miller Peanut Co.*, 77 *Ga. App.* 380 (49 S. E. 2d 221). Here, the employees' possession of the truck at night and over week-ends was, according to one phase of the evidence, a facility in the conduct of the defendant's business, first, because it provided a means of transportation for the hands to the location of work which they might not otherwise have had, and, secondly, because by further allowing them to use the vehicle for their own pleasure, he was able more easily to secure and keep hands. Had the case, therefore, been submitted to the jury and had the jury found that Bracy (1) was authorized to drive the truck, (2) was authorized to keep it over night, (3) was authorized to use it on personal missions including that of visiting friends, and (4) that this authority included the right to keep it at such friends' house overnight instead of at his own, then it follows as a matter of law that, when Bracy got in the truck at the friend's house in Forest Park the next morning after having spent the preceding night there and started out to pick up the other employees and go to the woods to haul pulpwood, he was on the business of the master. Although the plaintiff cites *Causey* v. *Swift & Co.*, 57 *Ga. App.* 604 (196 S. E. 228), and other cases dealing with temporary departure or deviation from the scope of employment, these cases are not strictly applicable. Bracy's spending the night with a friend in Forest Park was not in the course of his employment; but, if this use of the truck was permitted by the plaintiff, as the jury could have found, then he started from that point in the course of his employment instead of from his home, or the home of the other employee, Rivers. The cases cited and relied upon by the de-

fendant in error are those coming under the general rule that, where one's duties begin and end at his place of employment, one going to or coming from such place is not engaged in his master's business. In *Harmon* v. *Southeastern Compress &c. Co.*, 48 *Ga. App.* 392 (172 S. E. 748), the employee's traveling time between his home in Atlanta and his work in Savannah was his own, and was given him in lieu of vacation time. In *U. S. Casualty Co.* v. *Scott*, 51 *Ga. App.* 115 (179 S. E. 640), and *Welsh* v. *Aetna Casualty &c. Co.*, 61 *Ga. App.* 635 (7 S. E. 2d 85), as well as in *Stenger* v. *Mitchell*, supra, the employee in question was on his way home after having completed his duties, and was engaged on no mission whatever on behalf of the employer. In *Elrod* v. *Anchor Duck Mills*, 50 *Ga. App.* 531 (179 S. E. 188), he was on his way to work but had not arrived and had not commenced the duties of his employment.

The defendant also cites Gewanski *v.* Ellsworth, 166 Wis. 250 (164 N. W. 996), on the proposition that the effort of the master to accommodate and assist the servant does not bring within the scope of the master's employment acts of the servant otherwise without such scope. This principle of law is recognized, and the mere permission by Murray (if he gave it) to Bracy to use the car to visit friends would not put such personal use within the scope of his employment. The permission is, however, material, in that, if this act were done with Murray's consent, then his departure from that point to carry out the duties of his employment (if they were such) was the equivalent of his departure from his own home for the same purpose.

It is error for the trial court to grant a nonsuit where, admitting all the facts proved and all reasonable deductions from them to be true, the plaintiff has established her case as laid, and at the same time has not disproved her right to recover by establishing the existence of other undisputed facts which show that she is not entitled to a verdict. See Code § 110-310; *Clark* v. *Bandy*, 196 *Ga.* 546 (27 S. E. 2d 17). Here, if the disputed facts offered in evidence by the plaintiff and all reasonable deductions from them are admitted to be true, the plaintiff would have proved her case as laid. At the same time, neither such evidence nor other evidence in the record establishes the existence of other undisputed facts which show that she is not entitled

to a verdict.   Accordingly, the trial court erred in awarding a nonsuit.

*Judgment reversed.   Gardner, P. J., and Carlisle, J., concur.*