## 14380.   ROUNTREE *v.* SEABOARD AIR-LINE RAILWAY CO.

Even though a petition may not set out a cause of action, if the plaintiff proves every fact charged, without at the same time disproving his right to recover by establishing the existence of other undisputed defensive facts which show that he is not entitled to a verdict, it is not proper to award a nonsuit. *Evans* v. *Mills*, 119 *Ga.* 448 (1) (2) (46 S. E. 674). Applying this rule of practice to the facts of the present case, the grant of a nonsuit was error.

DECIDED NOVEMBER 27, 1923.

Action for damages; from Ben Hill superior court—Judge Crum. January 22, 1923.

George Rountree sued the Seaboard Air-Line Railway Company for damages because of injuries alleged to have been suffered by him while he was in the employment of the company as a section-hand. He alleged: that at the time of the injury he and other section-hands were engaged in repairing the defendant's railroad-track by removing defective cross-ties and supplying their places with new ones; that this was done by prizing or screwing up the steel rails with jacks, and, "after having thus released the pressure on the cross-tie to be removed, the lever of the jack would be turned loose and a pick would be stuck in the end of the cross-tie, by means of which it would be drawn out from under the rails; this was the method being followed and as directed by the section foreman;" that "on the named day petitioner was furnished with a jack which he had not previously used, and which was defective in that it had a broken tooth or cog, which defect was unknown to petitioner and which he could not see from ordinary observation, and his attention was not called to said defect;" and that while proceeding with his labor as directed by the foreman, "petitioner using the defective jack aforesaid (without knowledge of said defect), . . and when the rails they [petitioner and other laborers] were prizing up had been prized enough to loosen the cross-tie that was defective and intended to be taken out, petitioner released his hold on the jack-lever, in order to reach and get his pick, so as to stick the same in the end of the cross-tie and pull it out; but, on account of the jack petitioner was using being defective, having a broken or missing tooth or cog, the same did not hold, but when petitioner's hands released the lever of the jack the weight of the rail caused the defective jack to throw the lever out of its socket violently and forcibly upwards, striking petitioner," and inflicting upon him certain described injuries. It is alleged: that "the lever of said jack, being the part which struck petitioner, was an iron pipe or tube about three inches in diameter and about five feet long and very heavy; that the defendant was negligent in the following particulars: (*a*) in furnishing petitioner a defective jack as aforesaid; (*b*) in failing to notify petitioner of the defective condition of said jack; (*c*) in allowing the weight of pressure of the steel rail upon the jack in its defective condition; (*d*) in allowing and directing petitioner, he being a minor and not skilled in that line of work, to operate and work

with a defective jack without special instructions in order to make the work safe for petitioner; (e) in so directing and carrying out the work being done as to cause injury to petitioner." He alleged his age, earning capacity, etc.

At the close of the plaintiff's evidence the court awarded a non-suit, and the case is here upon exceptions to that judgment. The material portions of the plaintiff's testimony were as follows: "At the time I was hurt I was working [for the defendant], taking out ties and putting in new ones. In doing that work I would just jack up the rail and pull the old cross-ties out with a pick. It was an old jack that I was using that morning. I had been using a new one, and I didn't go down to the house that morning where they were always locked up, but met them at the depot, and they changed that new jack for an old one, and there was something the matter with this jack; it was broken, and I didn't know it. I jacked it up as high as I wanted it and turned loose to reach back for my pick to hit in the tie and pull it out, and it flew up, and one end hit me." "Some of the catches in that jack that they gave me was broken, but I couldn't see it; some of the teeth in the jack were broken. The next day after I went down there and tried to go to work I was looking in the tools in the car and saw that jack, and I took it and run it up and looked at it, run it up to see what was the matter with it, and there were three of those teeth in it that were broken out; they were broken clean off. If that jack had been sound it wouldn't have flew up that way and hit me; I had used other jack-screws the same way, and had never had one to fly up and hit me that way; the other jacks I had used had the teeth complete." "I had been working on the railroad section for about two or three months, had done that kind of work before, jacking up the steel rail and getting the cross-ties out from under it; that was a regular part of the work I had to do as a section-hand." "I had been working with a jack on this road for two or three months before I got hurt; hadn't gotten pretty familiar with it. I got acquainted with how to work it, but I wasn't no expert. I know how to work it. Couldn't tell when it was working good or working bad, and never had one to work bad at all before that. I didn't get the jack that morning, I met them at the depot; they carried the tools down to a house at night and locked them up. I don't know how many men were

working there, more than two or three. They had two jacks. The jack I had been working with was a new one, and I hadn't worked with this other one until that morning; that Friday morning when I went to work it was a different jack; I noticed that morning that it was a different jack, sort of paid a little attention to it; I didn't notice it much, didn't make any examination of it. This accident occurred after dinner, I reckon about two or three o'clock. I had been taking up ties that morning with that jack, had been working with that jack all that day until two or three o'clock in the afternoon. It had been in my possession all that day. I didn't have any chance to examine it. I was on the job. I couldn't examine it; it wasn't my job to do that; don't know whether I could have examined it if I had wanted to; there was nothing to keep me from it that I know of; I didn't examine it. I don't know whether I could have taken hold of it and pulled it out like I did afterwards. The way that jack worked was that you worked a lever up and down, and the stem would come up higher and higher until it got out of the case. You couldn't take hold of it with your hands and pull it out. You had to work it out. It hasn't got a reverse lever on it so that you can turn it over and it will fall out; I have never seen one that you could pull out that way. You could work it up and down with the lever so that the stem would come out, and you could see these teeth. When I did examine it on the morning after I was hurt I found that there were three teeth gone; they were broken clear off. I am sure that was the particular jack that I had used, because it had red paint on it. I didn't notice that the teeth were gone before I was hurt; don't know whether I could have found it out. With three teeth broken off you could raise that jack by raising the lever up and down. There wasn't nothing the matter with the stem that I know of. The teeth on the jack are put there to bring it up. It is not true that my hands were sweaty and it slipped. I went to take my hand off to reach and get my pick; it didn't slip." "I went back the next morning because I thought maybe I could work a little bit, and I tried to work, but I couldn't work. I didn't do anything there the next morning except to examine this jack; didn't go there to examine the jack. There were some fellows there when I went there, and they were all sitting there looking at the jacks, and I looked at them too." "Nobody was with me when I

examined the jack; I was just standing up there and looked at it. I ran it up with the knob; just took the knob in my hand and worked it up and down and ran it up. I don't know how long it took me, a pretty good while, ten or fifteen minutes I reckon. I don't know how many teeth it had; don't know how many times I had to work it up and down to get the stem out of the case. It was pretty hard to do. I did it by myself; nobody helped me. I don't know when that jack was broken; it was an old break, been broke a long time, had gotten rusty where it was broken off. These teeth I have been talking about are what raises the jack when you work it up and down. I hadn't been working with the jack all the time, hadn't been working with it but that one day that I got hurt. I hadn't carried the stem up high enough for me to see the broken teeth. Afterwards I did work it up until these three broken teeth came clear out of the top of the case and I could see them. I worked it up with the nub of the jack." "I worked it up to where I could see the teeth the next day. I have never used the jack that I got hurt with before. I didn't use any other jack than that that morning. I started to work with that jack about eleven o'clock, the first time I had used it, the first time I had put it under the steel rail to prize it up. I didn't start to using that jack until ten or eleven o'clock that morning, and I got hurt about two or three o'clock in the afternoon. Had used that jack that morning. It hadn't caused me any trouble about throwing the lever before the time I got hurt." "The broken teeth were not at the top of the jack; were in the middle like. I don't know how many good teeth were at the top before you come to the broken ones. I never counted them. There were more than three good teeth before you come to the broken ones. I don't know how many teeth there were in that jack."

The plaintiff's injuries were shown by the evidence to have been more serious than he at first seemed to think, necessitating ultimately an operation. There was evidence also of his earning capacity.

*Eldridge Cutts, Hal Lawson,* for plaintiff.

*Whipple & McKenzie, A. J. & J. C. McDonald,* for defendant.

BELL, J. (After stating the foregoing facts.) It may or may not be that the petition alleges a cause of action (see, on this question, *Decatur Lumber Co.* v. *Fulton,* 26 *Ga. App.* 499 (4), 106 S. E. 609; *Lawrenceville Oil Mill* v. *Walton,* 143 *Ga.* 259 (1),

84 S. E. 584; Civil Code (1910), §§ 3130, 3131) ; and a cause of action may or may not be shown by the evidence. These questions are not involved. "A nonsuit will not be granted where the plaintiff proves his case as laid. *Kelly* v. *Strouse,* 116 *Ga.* 872 (4 *b*). This ruling does not lead to the result that it is necessary to submit the case to the jury even though it appears on the plaintiff's evidence that he is not entitled to recover. Nor is it in conflict with the Civil Code, § 5347 [Civil Code of 1910, § 5942], since that section evidently contemplates a trial upon a petition which sets out a cause of action. Usually there is such a petition, and the plaintiff by proving his case as laid makes out a prima facie right to recover, and it would of course be improper to grant a nonsuit. If he fails to prove what he has thus alleged, or if he actually proves every fact charged, but, on cross-examination or otherwise, disproves his case by establishing beyond doubt the existence of other defensive facts which make it manifest that he ought not on the whole evidence to recover, then the Civil Code, § 5347 [supra], declares that 'a nonsuit will be granted.' " "But where the defendant has failed to test the sufficiency of the petition by demurrer at the first term, and the petition sets out no cause of action, it does not follow that proof of the idle allegations therein will compel the court to do a useless thing, and refer to the jury that which is so vain and nugatory that a judgment on a verdict in favor of the plaintiff would have to be arrested. Civil Code, §§ 5362, 5046 [Civil Code of 1910, §§ 5957, 5629]. In such instances, however, the vice is in the petition rather than in the proof. The remedy is not by motion to nonsuit, which is intended to test the sufficiency of the evidence, but by motion to dismiss, which is aimed at the fatal defect in the pleading. Compare *O'Connor* v. *Brucker,* 117 *Ga.* 451." *Evans* v. *Josephine Mills,* 119 *Ga.* 448, 450 (46 S., E. 674). See also *Atlanta Railway & Power Co.* v. *Johnson,* 120 *Ga.* 908 (1) (48 S. E. 389) ; *Duke* v. *Bibb Mfg. Co.,* 120 *Ga.* 1074 (48 S. E. 408).

In the case of *Kelly* v. *Strouse,* 116 *Ga.* 872 (4 *b*) (43 S. E. 280), it is said that on a motion for a nonsuit "the only question is whether the evidence is sufficient in law to maintain the issue in fact made by the pleadings;" "if the evidence supports the issue made by the pleadings, it is proper to overrule a demurrer to the evidence, or a motion for a nonsuit in the nature of such demurrer,

but it is not thereby adjudicated that the pleadings are in law sufficient to authorize a recovery;" "'proving a case as laid' will prevent a nonsuit." It would seem, under this rule of practice, that where the sufficiency of a petition is not tested by demurrer or motion to dismiss, and the case is brought here merely upon exceptions to the grant of a nonsuit, all substantive law becomes immaterial, and this court, in reviewing the judgment, is confined to a comparison of the evidence with the standards of the suit,—not of the law,—and announcing the result.

Mr. Justice Lumpkin, in *Florida Coca-Cola Bottling Co.* v. *Ricker,* 136 *Ga.* 411, 420 (71 S. E. 734), speaking for himself, expressed dissatisfaction with the rule of practice above referred to (see also Civil Code of 1910, § 5573), but we have found no decision of the Supreme Court which would warrant this court in declining to observe it in a case like the present, although it seems that this rule is subject to an exception in cases of ejectment (and why not also in trover?) where the property is so indefinitely described that no lawful verdict could be rendered. *Williams* v. *Perry,* 136 *Ga.* 453 (2 *a*) (71 S. E. 886). To us it seems that in no case where the petition fails to set forth a cause of action should a nonsuit be reversed because the case was proved as laid, but that the judgment, though incorrect in point of practice, should be affirmed on the idea that the error was harmless. We have not found, however, that the Supreme Court in any case has adopted such a course.

We do not mean by the foregoing to intimate that the plaintiff has not alleged or proved a cause of action. We have intended merely to impress the fact that whether he has or not done either is a question not presented for decision under the record, and that we should determine only whether the allegata corresponds with the probata, provided the plaintiff has not disproved "his right to recover by establishing the existence of other undisputed facts which show that he is not entitled to a verdict." It would seem, therefore, in view of the above, that any discussion of the correlative duties between master and servant would be out of place, unless pertinent under the proviso just quoted.

We have compared the allegations and the evidence, and in our opinion the plaintiff has established his case as laid, without disproving any undisputed defensive facts which would disentitle him

to recover. Nevertheless, we will venture a few additional observations. The defect in the jack appears to have been one not discernible by a superficial observation, not obvious in the ordinary use of it, but was "such as would be disclosed only by a positive and careful investigation, and would not be manifest to a person of ordinary intelligence or experience in the line of work in which the servant was engaged." *International Cotton Mills* v. *Carroll, 22 Ga. App.* 26 (1 *a*) (95 S. E. 472). The missing or broken teeth were not revealed in the ordinary operation of the jack, in the performance of the plaintiff's duties. He testified: "I hadn't carried the stem up high enough for me to see the broken teeth. Afterwards I did work it up until these three broken teeth came clear up out of the top of the case and I could see them." This was on the positive inspection which he made on the day following his injury, and which it appears required a special manipulation consuming "ten or fifteen minutes." "The broken teeth were not at the top of the jack, were in the middle like." It may be inferred that they were in the middle of the "case."

"Whether the plaintiff had the same opportunity as the defendant, of knowing of the defects alleged and proved, would depend upon the character of such defects,—whether they were latent or patent. Where the defect is superficially discernible or plainly apparent to the eye, the servant has the same opportunity of seeing it and knowing of it as the master. But if the defect is latent, the master would be held bound to discover the fact sooner than the servant, because the duty of inspection rests on the master, and not on the servant. In a case of latent defects,—those which are only discoverable by proper inspection,—the master is necessarily held to a higher standard of conduct than the servant, since the master owes to the servant the duty of inspection. *Hubbard* v. *Macon Ry. & Light Co.,* 5 *Ga. App.* 223 (62 S. E. 1018) ; *Cedartown Cotton Co.* v. *Miles,* 2 *Ga. App.* 83 (58 S. E. 289)." *Cochrell* v. *Langley Mfg. Co.,* 5 *Ga. App.* 317 (3), 324 (63 S. E. 244).

The fact that the plaintiff discovered the defects "by a positive and careful examination" subsequently to his injury does not show that he had equal means with the defendant of knowing of the defect, for the reason that a failure to make such inspection prior to his injury was not a violation of any duty enjoined upon him, the defect appearing by the evidence to have been latent. See

*Decatur Lumber Co.* v. *Fulton,* 26 *Ga. App.* 499 (1) (106 S. E. 609). The fact of the discovery of the defects in the manner shown would tend to establish the negligence of the defendant in not having discovered them itself by the discharge of its own duty of inspection, which is corroborated by the further fact, as testified to by the plaintiff, that "it was an old break, had been broken a long time, had gotten rusty where it had broken off." The plaintiff's evidence shows, as he alleged, that the defect was unknown to him and could not be seen from ordinary observation, and otherwise tended to support the averments of his suit. The judgment of nonsuit was therefore erroneous.

This case is unlike that of *Bolden* v. *Central of Georgia Railway Co.,* 130 *Ga.* 456 (60 S. E. 1047), in which the defects were obvious and discernible by superficial observation. In *Morris* v. *Charleston & Western Carolina Railway Co.,* 22 *Ga. App.* 186 (95 S. E. 748), no general propositions of law were laid down, but the decision was confined to the particular facts of that case. Whether the ruling there made is sound or unsound, the court was ruling upon the sufficiency of a pleading, while here the only question is whether the plaintiff proved his case as laid. The present ruling does not impinge upon either of these cases.

*Judgment reversed. Jenkins, P. J., and Stephens, J., concur.*