Regardless of whether a petition sets out a cause of action, if the plaintiff proves every fact charged, without at the same time disproving his right to recover by establishing the existence of other undisputed facts which show that he is not entitled to a verdict, it is not proper to award a nonsuit. On application of this rule of practice to the facts of the present record, the grant of a nonsuit was error.
 No. 14616. SEPTEMBER 11, 1943.
Clark sued Bandy. It is recited in the bill of exceptions that on the call of said case for trial the judge overruled the defendant's demurrer, and announced that he would not try any question of the amount of recovery at this trial, but that he would submit to the jury the questions whether a contract of partnership was entered into between the plaintiff and the defendant, and, if not, whether there was a contract between the parties to form a partnership, and breached by defendant, and if these issues were found in favor of the defendant that finding would terminate the case; however, if the jury should find either issue in favor of the plaintiff, then the case would be referred to an auditor for the purpose of ascertaining the amount the plaintiff would be entitled to recover.
The first count of the petition as amended alleges as follows: In 1937 the plaintiff and the defendant, who were brothers-in-law, were partners in a hotel business at Cartersville, Georgia, known as the Braban Hotel; and the defendant and Fred R. Prater were partners in a bedspread manufacturing business at Rome, Georgia. In December of that year such bedspread partnership was dissolved, and Bandy took over the business. Immediately thereafter, on or about December 15, 1937, the defendant proposed to the plaintiff the formation of a partnership under the following conditions: Plaintiff would take over the active management and operation of the bedspread business at a salary of $125 per month, with the option to purchase from defendant a one-fourth partnership interest in the business at any time he saw fit, on the basis of the net book value of such one-fourth interest as of the first day of January, 1938. Defendant proposed that he would finance plaintiff, and that plaintiff might pay for his one-fourth interest out of the profits of the business. Under *Page 547 
those conditions plaintiff gave up the active management of the Braban Hotel business in Cartersville, where he owned one fourth and Bandy owned three fourths, and took over the active management of the bedspread business in Rome. After operating the business for one year, plaintiff advised defendant that he desired to exercise his option under the agreement to purchase a one-fourth undivided interest in the business at the book value as of January 1, 1938. Defendant agreed thereto, and agreed that he would execute to plaintiff articles of partnership in accordance with their oral agreement. Defendant told plaintiff at that time that he believed that they should dissolve their partnership in the hotel business before articles of partnership should be prepared; whereupon plaintiff proceeded to surrender all of his interest in the Braban Hotel to defendant, and then moved his wife from Cartersville to Rome, and continued to manage the bedspread business, relying upon defendant to carry out his agreement; the interest in the hotel which he relinquished being the active operation of the same. It was not alleged that plaintiff owned title to the hotel, or to any undivided interest in the title thereto, though he had contracted to purchase the same. Defendant never executed formal written articles of partnership with plaintiff; yet plaintiff continued to operate the business until about August 20, 1942, at which time the defendant repudiated the partnership contract, excluded the plaintiff from the business and the premises where it was located, and refused to account to plaintiff for any portion of the profits or the assets of the business. As of January 1, 1938, the net assets of the business were $70,363.33. As of August 20, 1942, the net assets of the business were approximately $220,000.
Plaintiff alleged, that by reason of the oral agreement between himself and defendant he and defendant were partners; that he had left his one-fourth undivided interest in the profits in the business, and drawn only a small salary therefrom; and that at the time he was excluded from the business his interest in the business exceeded in value $35,000. He prayed for an accounting, and for judgment. Count two of the amended petition alleges substantially the same facts as have been just detailed, except that it alleges, that the contract between plaintiff and defendant was a contract to form a partnership to be consummated by the execution of formal articles of partnership; that plaintiff performed all of *Page 548 
the obligations imposed upon him under said contract, but defendant failed and refused to execute formal articles of partnership; that on or about January 1, 1942, defendant told plaintiff that the business had been very profitable, and that he didn't feel that he should carry out the agreement to sell plaintiff a one-fourth interest on the basis agreed upon, when the business had already earned for plaintiff more than that amount, and insisted that plaintiff negotiate with him a contract for a smaller interest or on a different basis; that plaintiff did negotiate with defendant, but they never reached any basis for settlement or agreement other than the agreement originally entered into between them; and that these negotiations, induced by the defendant, continued to about August 20, 1942, at which time defendant ordered plaintiff away from the premises where the business was conducted.
The pertinent portions of the testimony relating to the agreement between the partners were as follows: From the deposition of the defendant taken before the trial: "I think I bought Fred Prater's interest in the partnership, took it over along the last of November, 1937. . . I think it was about the last of December or first of January when I got in touch with Ernest and called him over and gave him a job. As I remember the gist of the conversation, our trade was this: I told him, `I don't know whether the business will suit you or not. I have been thinking about this, and figure that your wife can look after the hotel, and I don't know whether this business will pay or not; but if you want to try it out, I will give you a job. It will start you off at $125 a month until we get straightened out here. Why, I will give you more money,' And I think it was run practically all that year; his salary remained at $125. About January 1, 1938, I told Ernest this, I says, `If the business works out all right and you want an interest in it, I will sell you up to twenty-five per cent. Interest in it. I knew that Clark had no money or resources. He couldn't have bought it unless he saved some money, unless we come to some terms on how about selling the interest on credit. I didn't anticipate that he could save enough out of $125 a month to buy a one-fourth interest. However, his wife was working over there at the hotel, and with what they was getting over there it was quite a bit more than $125 a month. Out of the profits of the company ultimately would have been about the only way he could have paid *Page 549 
for it unless he was more conservative than he was while he was there. . . I told him if the business went over and he wanted an interest in it, I would sell him up to one-fourth interest in it. He says, `I will try it.' He came here and went to work at $125 a month, and also the proposal that if it worked out all right, and he wanted an interest, I would sell him up to one-fourth interest. At the beginning of the year 1939 nothing was said between me and Mr. Clark as to consummating the partnership. During the year 1939 not anything was said about a partnership, or details pertaining to it or anything that I have any recollection of. Back in 1937 and when I made the trade with Mr. Clark, and when I told him I would sell him up to twenty-five per cent interest in the business, there was not any discussion about terms or anything; the only thing that was said was what I have stated. My invested capital as of the time Mr. Clark came over and took charge, I think it showed, after forming the new company or taking it over from Fred Prater, and taking all deductions that was possible off of material and depreciation, there was something over $70,000. That was not the figure I had in mind when I told Mr. Clark that I would sell him up to one-fourth interest in the business. I wouldn't have had any thought of selling him an interest at only what it cost me. My total investment at Rome at that time was about $75,000 or $78,000. That is the figure I had in mind when I told Mr. Clark I would sell him up to one-fourth interest. . . After the discussion I had with Mr. Clark before January 1, 1938, there was no further discussion of the same subject-matter, not as far as drawing up any papers or anything. . . The only thing that I ever remember was in 1940, with regard to the partnership, that I had a little talk pertaining to a lot of things, and that was mentioned. I mentioned that proposition that I made him when he went to work over there, the offer that I made that he could have a twenty-five per cent. interest in it. . . I told him if it was successful and he wanted an interest in it, I would sell him up to twenty-five per cent. . . That was in 1940. We failed of making a $30,000 profit that year by only $31.96. That was six months that I virtually operated it myself. It was understood between me and Mr. Clark during all of these operations that he had the right to buy up to twenty-five per cent. of the business any time. I made him that proposition, but we *Page 550 
never did get to any talk about terms, not price or anything. That was the extent of the discussion."
The plaintiff testified: "I am 38. . . I am a brother-in-law of B. J. Bandy, and have been seventeen years. In 1937 I was manager and had an interest in Hotel Braban at Cartersville. I went into it as manager when it was opened up, and later contracted for an interest, one fourth, on credit from Mr. Bandy. We had a bond for title drawn up, from Mr. Bandy to me, to convey a one-fourth interest. I made a note for a one-fourth interest in it. Around the first of December, 1937, we talked about this bedspread business in Rome. He called me, and he was telling me what a mess the business was in. That was a bedspread business that he was in partnership in with Fred Prater in Rome previous to that time. . . I says, `Well, if I can help you out I will be glad to do it; it is not far to Cartersville; I can drive back and forth.' He said, well, he would think it over, and the next week or some time after that he `phoned me from Dalton and asked me how my nerve was. I told him very good. He said meet him over at Rome that morning, which I did, and at that time he asked me if I still thought I would like to come over and get the business straightened out. I told him I would do anything I could to help him out. He says, `All right and have an interest in it.' I said, `How much?' He says, "Twenty-five percent.' I says, "At how much?' He said, whatever he had in it. I says, "That sounds fair to me. I will be glad to work hard and get it straightened out.' We went on through 1938. I drove back and forth to Cartersville. In the latter part of 1938, I think, in November, we leased a new location down on Third Avenue. I mean I took charge of the operation of that business. Mr. Bandy was over there once a week or so. That went on until I think in November, 1938, when we leased a new location, and Mr. Bandy asked me if I wanted to continue on. I told him I would like to. I thought it was working out very nicely. He says, well, if I was, I ought to cancel out the contract at Cartersville and move to Rome. I told him all right, whatever he suggested, and we did move to Rome, moved to Rome about January 1, 1939, and I canceled out my arrangements at Cartersville with him, and I told him I thought we ought to draw up the papers for the bedspread business. He said, well, we would do that in a little while. I *Page 551 
meant the partnership papers; he said we would get to that in a little while. I told him o.k. So that went on through 1939 just as we were going, and the first of 1940 I suggested it again. He said to put it off. I told him, all right. Then in the summer of 1941 — things just continued the same — I wrote him a note over to Cartersville about something, and included in the note, at the bottom of it, I thought wasn't it about time we went ahead and drew up the partnership papers we had been talking about almost four years? and in a few days after that we were in conversation over the telephone, and Mr. Bandy stated he would be over at Rome in a few days and get the papers drawn up, and he never did mention it any more until 1942. When I wanted to get it straightened out some way or other, and was never able to get Mr. Bandy to do as he promised he would. He put me off several times about reducing it to writing. He at no time denied that I was a partner with him during that period and entitled to receive twenty-five per cent. Until 1942, to my knowledge. From the time I started working there under the arrangement that I would have a twenty-five per cent. interest until summer of last year, he did not at any time deny that I was a partner and entitled to a twenty-five per cent. interest in the business on a work-out basis.
"When I first went over there, it was operating under the name of Fred R. Prater Company for a few months, and then changed the name to Southern Craft Company. He told me to go to the court-house and register that name. That was prior to the time he told me he would take over my interest in the Braban Hotel and asked me to move to Rome with my family. . . I thought he would do what he said he would do. That had a bearing on my letting the matter drag along without having the contract reduced to writing. I was doing what he told me to do. I didn't insist on it being reduced to writing on December 31, 1938. . . During the approximate four years I was there operating that business under the arrangement I testified about, it made money. I was to come in the business on the same basis Mr. Prater had been there. Mr. Bandy used these words: He would take me into the business on the same basis Mr. Prater had been in business with him. In one of the discussions when he came over from Cartersville that is what he said, he said Mr. Prater had a fourth *Page 552 
interest, and I could have the same thing on the same basis. I told him that was all right with me, I would be glad to try it. He did not tell me how Prater was to pay for his one-fourth interest. The only way I could pay for my one-fourth interest was to work it out, on a work-out basis. B. J. knew that, I suppose. He agreed to it on that basis. He said come on over, see what we could do then. In the latter part of 1938 I had some discussion with B. J., and he told me, before he reduced the partnership papers to writing, that he thought I ought to cancel out the arrangement I had at Cartersville. This is the bond for title from Bandy to me, and a promissory note for $16,250, dated January 1, 1935. . . They were canceled. I surrendered all my interest in the Braban Hotel. . . There was never any misunderstanding between us as to what the terms of the original agreement were, not until about July or August, whatever that date is there, about a written agreement, except he wanted me to accept a bonus proposition once or twice, first mentioned in January, 1942. . . Miss Dixie Bandy, Mr. Bandy's daughter, came down in the fall of 1940. Mr. Bandy told me he would like for her to come down and learn the business. The following transaction at the time my connections with Southern Craft Company were terminated: Mr. Bandy came down there one day, said he couldn't go any further with me, and I could just get out. That was after I refused to sign this proposed written agreement his attorney had drawn up. . . He [defendant] drew out, before I severed my connection with the business, around fifty-four or five thousand dollars. I drew $500 I believe in December, 1941, and $1000 in the spring of 1942. That was in addition to my drawing account of $225 a month. During those four years I was manager of the business. I devoted my entire time to it. . . I received this letter dated August 20, 1942, signed by B. J. Bandy: "You are hereby dismissed as assistant manager and employee of Southern Craft and myself. Your salary for this month has heretofore been paid. You will immediately remove your personal effects from the premises of the Southern Craft and remain away from said premises and transact any business that you may have with Southern Craft with me personally." "P. S. You are directed to turn over to Jeff Bradley all keys to Southern Craft property and the Post-Office key."
On cross-examination the plaintiff testified: "Bandy told me *Page 553 
when I went over there that he would sell me a one-fourth interest based on whatever he had in it as of January 1, 1938. No definite time for acceptance was mentioned. All that was said, we would try it, see how I got along, if I liked it I could buy it. All the time we were building additional machines. We were paying for it out of the business. He told me I would have to pay him one fourth whatever value it was in 1938. I did not know definitely at that time, neither did he. I knew it was to be one fourth of whatever the book value showed, whatever the auditor's report showed it to be. I was to pay him for that as the profits would pay it. This was the only way I had to pay for it. The understanding was, my profits was to come solely from the profits. Whether if it made no profits I was to have no interest, it was a trial proposition; if it hadn't gone over, I don't guess the business would have operated. It would have closed up. I wouldn't have had any interest. Mine was solely on a profit basis; provided it was a success. I was never to put any money into it. I didn't have any money to put into it. If we hadn't started making money, Mr. Bandy wouldn't have continued to operate the business, I don't guess, and I would have had no interest. If it made $6000 in 1938, I would have $1500 of that $6000, to apply on the purchase. Suppose that in the year 1938, instead of making $6000 the business would have shown a loss of $6000 at the end of 1938, if Mr. Bandy saw fit to continue the operation, I would have been one fourth interested in that loss. That was my understanding. I went there purely as a trial proposition; if we made a success, if the business went over, all right; if it was not a going proposition, why, I assumed naturally he was going to close it up. That is the agreement we had. That was his promise to me; if it was a going proposition, I could buy into it a one-fourth interest. . . I went to the clerk's office and registered the business in the name of B. J. Bandy sole owner, at the request of Mr. Bandy. That was soon after we started. We didn't know then whether it would be a partnership or not. This is dated January 19, 1938. That was not after I had surrendered my interest at Cartersville. I surrendered that January 1, 1939. No new contract was made at that time. I asked Mr. Bandy if we shouldn't draw up our partnership papers for the bedspread business; he postponed it said wait a little while. We were still operating under that original *Page 554 
agreement. . . As to carrying myself on the records down there as an employee and the company paid social security on me, I don't know whether I would be classed as an employee or not. I am not certain about that. I don't know what the circumstances would be under the agreement that I had with Mr. Bandy. I know I was drawing $225 a month on a drawing account. I don't know whether i would be termed an employee or not. Social security was deducted out of my pay. I never gave it any thought, and the payroll was just like the rest was; the bookkeeper just deducted what the social security was. When I made my income-tax return. I never gave any thought of returning any profit from that. I didn't make any income-tax return for the business. We never discussed the tax angle; and I wasn't familiar with taxes, never gave it a thought. I was busy with the plant. I didn't know I was to make a partnership return. I never included anything from any partnership on any of my income-tax returns. I gave the property in down in Floyd County to the tax-receiver as the property of Mr. Bandy up to the time he let me go. As late as July of 1942 we were making an effort to get together on price and terms for the sale of the one-fourth interest of this business. We had several conferences over at Cartersville from May through July. The last effort was this contract which Judge Ault drew up. . . The terms of payment had been agreed upon, those terms of payment as agreed upon in January, 1938. That was in case it made money; that is the way the trade was made. We put it off from time to time at Mr. Bandy's request, on drawing up the partnership papers. Q. `Trying to get together on terms of payment and everything and drawing up the partnership papers?' A. `Yes, sir.' Q. `In other words, you were still hoping you could make a trade on the partnership?' A. `Yes, sir. . .' While I was manager there was several garnishments served on Southern Craft there at Rome. I don't recall filing any answer. I always had the employee garnished to get a release on the garnishment. This is my signature to this garnishee's answer in the case of Miller Installment Company vs. Blanch Strickland. I made that, E. C. Clark, who on oath duly says he is agent for garnishee and is authorized to make this answer. I signed that, dated April 3, 1940."
Roy Windham, a witness for plaintiff, testified: "I live at Douglas. *Page 555 
I am a flight instructor, members of the air force in flying. Prior to going to Douglas I was an employee of Southern Craft. I was working under Mr. Clark, who was manager of the business. I built the machines for Southern Craft after January 1, 1938. They were built in Rome at the plant. When I went there, there were around forty machines. When I left there, there were in the neighborhood of four hundred. While there I developed new machines and applied for patents on new machines. My written contract expired in October, 1939. Prior to October, 1939, Mr. Bandy had not said anything to me about whether or not E. C. Clark had any interest in that business as a partner. I had a talk with Mr. Bandy about leaving. Of course I wanted to leave, and he came down to see me about it. I had written him a letter of resignation. We talked it over, and he wanted me to stay on, said he thought we was doing pretty good thing and probably make a lot of money, build into a pretty good thing if we all worked hard; that Mr. Clark was working for an interest in the business, twenty-five per cent. Interest; that he would like to take me in for an interest in the business. That conversation took place that he told me Mr. Clark was working out a twenty-five per cent. interest in the business the latter part of 1939, I would say September or the first of October. I was present nearly on all matters in the plant between Mr. Bandy and Mr. Clark, on matters that came up concerning plant expansion or building more machines, matters of that nature, and on lots of occasions Mr. Bandy would make the remark, `We will' do so and so; `we will take that in consideration when we drew our partnership papers. We don't want to do this. I don't know as it will pan out best for us.' On many different occasions I heard him make the remark as I have detailed, that we will take all this in consideration when we drew up the partnership papers, when spending money or doing plant expansion; when anything important came up, I was usually in on the discussion."
The plaintiff introduced a writing signed by B. J. Bandy and Fred R. Prater, as follows:
"August 27, 1936. To whom it may concern: This is to certify that B. J. Bandy and Fred R. Prater are sole owners of Fred Prater dealer in bedspreads as "The House of Prater." B. J. Bandy is owner of three-fourths and one-fourth Fred R. Prater. Each one certifies that they owe nothing other than we have listed, *Page 556 
both [but?] each partner has orthity to write checks and pay out monies only for material and expencies only pertaining to this business, neither party shall write checks or take and [any?] moneys for his personal use without the concent of the other. Fred R. Prater's salary is one hundred dollars per month and B. J. Bandy's fifty dollars per month."
[Signed] B. J. Bandy. Fred R. Prater."
Also, a contract between the same parties, dated December 4, 1937, as follows:
"This agreement entered into this the 4th day of December, 1937, between B. J. Bandy and Fred R. Prater, trading as Fred R. Prater Co., a partnership in the City of Rome, Georgia. The partners, B. J. Bandy and Fred R. Prater, desire to terminate the partnership of Fred R. Prater Co. as at November 30, 1937. It is hereby agreed that B. J. Bandy will buy out the interest of Fred R. Prater on the basis of the assets and liabilities at November 30, 1937, after a physical inventory has been made. This purchase is to be at 100 cents on the dollar, as shown on the balance sheet. It is also agreed that the name of Fred R. Prater Co. is to be continued as the trade-name of B. J. Bandy." Also, a letter from defendant Bandy to plaintiff Clark, dated October 21, 1940, as follows: "Ernest: I did not tell you what to pay Dicksie. It will take at least $100.00 for her to get by on, so pay her $100.00 per mo., and when we draw our papers for partnership this can be discussed." As to this letter the plaintiff testified: "This statement of October 21, 1940, Mr. Bandy referred to Dixie in there; that is his daughter, Miss Dixie Bandy. That is the time when she came down to work there. This was received by me through due course of mail on or about the date here, October 21, 1940, soon after that."
Also, letters dated August 10 and August 20, 1942, written by defendant to plaintiff, as follows:
"Please turn over all keys pertaining to Southern Craft Company to Alma this afternoon. You are hereby dismissed as assistant manager and employee of Southern Craft and myself. Your salary for this month has heretofore been paid. You will immediately remove your personal effects from the premises of the Southern Craft and remain away from said premises and transact any business that you may have with Southern Craft with me personally. *Page 557 
P. S. You are directed to turn over to Jeff Bradley all keys to Southern Craft property and the Post-Office keys."
The plaintiff, recalled, testified: "My agreement with Bandy as to how I was to pay for my one-fourth interest was from the profits, only way I had to pay it. I had the agreement with Bandy. We discussed it, and he agreed I could pay for my one-fourth interest out of the profits of the business." By the court: "Suppose there wasn't any profits, how was it to be paid?" A. "As I said awhile ago, if there wasn't any profits, I guess Mr. Bandy would close the business up." Q. "What was your agreement if there wasn't any profits?" A. "Wasn't any agreement on that phase of it. As of December 31, 1938, when I told Mr. Bandy that I would go in with him, the profits in the business was something over $6,000." Q. "When did you agree to pay for this one-fourth interest? Is that when you first went to work?" A. "Yes, sir, the agreement was that I was buying a one-fourth interest." Q. "That was when you first went to work?" A. "Yes, sir." Q. "The agreement was when you first went to work it was to be paid for out of the profits?" A. "Out of the profits of the business. I was buying as of January 1, 1938. I told Mr. Bandy that I would do that when Mrs. Clark and I moved to Rome, sometime during January, 1939." On cross-examination the plaintiff testified: "He [Bandy] attempted to draw up a written agreement in 1942. The written agreement he tendered to me did not embody the terms of the oral agreement under which we had been working up to that time. The proposed written agreement, dated the ____ day of July, 1942, between B. J. Bandy and E. C. Clark was drawn up in Cartersville by Judge Ault, Mr. Bandy's attorney. When this proposed written agreement was submitted to me I did not agree to it. It wasn't anything like our agreement we had in the beginning. I told him at that time that I was willing to enter into a written agreement embodying the oral agreement we had been working under. He wanted me to sign that agreement there. That agreement would have left me nothing, wouldn't have amounted to anything for me. However, Mr. Bandy insisted that I sign that particular agreement. I told him I wouldn't sign that, because I might as well not have anything as that agreement there. The original agreement had been discussed, talked about all during the year 1942, *Page 558 
up until I left Southern Craft, what our original agreement was. This letter addressed to me, signed by Mr. B. J. Bandy, dated July, 1942, I got this letter. I went to Cartersville along about this time. That was along about the time that this contract which Judge Ault drew. I didn't agree on the commission basis. I got the thousand-dollar check. So far as I know, the original agreement we had was still in effect. He was to sell me a one-fourth interest." Q. "And this was for the purpose of agreeing upon the terms by which Mr. Bandy would finance you, wasn't it?" A. "We had already agreed on the terms. My interest would be paid for out of the profit of the business." Q. "That is the only agreement you ever made with Mr. Bandy, the only method by which you agreed to pay him, was out of the profits?" A. "That is right. If it made no profits wasn't discussed. As far as our agreement was concerned it would make a profit. The time we entered into this agreement was prior to January 1, 1938." Q. "Prior to that time the only contract that you contended that you ever had with Mr. Bandy was prior to January 1, 1938?" A. "Well, our contract was to date from January 1, 1938, when it was finally — the contract was, I was to have a one-fourth interest in the business, and pay for it out of the profits, on a work-out basis." By the court: Q. "When was that agreement made?" A. "That was in, I think, the early part of December, 1937." Q. "Before you went to work?" A. "Well, I went right to work, but our agreement was to start as of the first of the year."
At the conclusion of the evidence, the court on motion granted a nonsuit, to which judgment the plaintiff excepted.
It is as much the duty of this court to refrain from passing upon issues not embraced within the errors assigned as it is to decide those that are. That which lies beyond the exceptions is forbidden ground. What are the essentials of a cause of action, whether or not the alleged contract relied on is lacking in mutuality, or the agreement void because of lack of certainty in its terms, and other kindred questions referred to in the briefs, although presenting an inviting field, is one which this court on this record can not enter, because the sole assignment of error is *Page 559 
one that protests the granting of a nonsuit. In some jurisdictions, the reviewing court in passing upon such an assignment will look to the pleadings; but a contrary rule prevails in this State. With us, a motion for nonsuit merely takes the place of what is known to the common-law practice as a demurrer to the evidence, and on such demurrer no exception can be taken to the pleadings. Kelly v. Strouse, 116 Ga. 872,881, 882 (43 S.E. 280), and the English authorities there referred to. After quoting from Anderson v. Pollard, 62, Ga. 46, 50, the statement by Mr. Justice Bleckley, that "A motion for a nonsuit is aimed at the evidence as compared with what the declaration is, not at the declaration as compared with what it ought to be," it was further stated in Kelly v.Strouse that "The ruling in the case last cited is supported by the earlier rulings, and has been followed in nearly all the later decisions;" and of the apparently contrary rulings inAlford v. Hays, 87 Ga. 155 (13 S.E. 315); and Zettler v.Atlanta, 66 Ga. 195, it was said that they must yield to the earlier cases. Certain language in the Code, § 110-310, might seem to support the view that a nonsuit should be granted in all cases where the plaintiff ought not to recover; but this was considered in Kelly v. Strouse, where it was decided that nothing in that section changed the rule that had been established in this State, and which, with the two exceptions above noted, had been uniformly followed, to wit, that when a court passes upon a motion for nonsuit it decides only one question, that is, do the allegations and the proof correspond? On this question see Rountree v. Seaboard Air-Line RailwayCo., 31 Ga. App. 231 (120 S.E. 654), where later rulings by this court were cited in support of the proposition that even though a petition may not set out a cause of action, if the plaintiff proves every fact charged, without at the same time disproving his right to recover by establishing the existence of other undisputed defensive facts which show that he is not entitled to a verdict, it is not proper to award a nonsuit.
One count in the petition in the instant case sounds in equity, the other in law. It was said in Sandeford v. Lewis,68 Ga. 482, that there is no such thing as a nonsuit in equity practice. It can readily be understood how under the English equity practice, and indeed under that followed in the Federal courts in this country, there could be no such thing as a nonsuit, because the chancellor *Page 560 
without a jury decides issues of fact as well as law. If on the trial the chancellor finds in favor of the defendant, even though the testimony be in conflict, the usual order taken is that the bill be dismissed. 1 Foster's Federal Practice (2d ed.), § 300. In Hart v. Henderson, 66 Ga. 568, this court said that technically there is no such thing as a nonsuit in an equity cause, and in affirming the grant of a nonsuit in such a case said that there was no evidence on which a decree could be had for the complainant as the pleadings then stood, and that the nonsuit was equivalent to a motion to dismiss, which should have been granted. In Wilson v. Hall, 67 Ga. 53, it was ruled in an equity case that if the evidence on the trial fails to sustain the allegations of the bill, "a motion to dismiss, in the nature of a nonsuit, may be granted." In Frank v. Atlanta StreetRailroad, 72 Ga. 338, may be found the statement that a motion to dismiss a bill in equity is analogous to a motion for a nonsuit at law, and that the same general law is applicable to each case. The four cases referred to immediately above were decided before the passage of our act approved October 24, 1887 (Ga. Laws 1886-7, p. 64), which in reality abolished the court of equity as a separate court, and established a uniform mode of procedure in all civil suits in the superior courts of this state. In none of the Code sections where nonsuit is mentioned is there anything to indicate that it was designed to be available only in law cases. We have no hesitancy in holding that under the uniform procedure act above referred to, it may be employed in a case seeking equitable as well as in one which merely seeks legal relief, even though originally it was unknown to the equity practice; and when a motion for nonsuit is made in an equity case that is being submitted to a jury, it should in all respects be dealt with as if it were presented in a case at law.
Since a failure to set out the plaintiff's cause of action with sufficient clearness is no ground of nonsuit (Jossey v.Stapleton, 57 Ga. 144), and defective pleadings afford no reason for the grant of a nonsuit (Greenfield v. Vason,74 Ga. 126), and since the office of such a motion is not to test the legal sufficiency of a petition (Reeves v. Jackson,113 Ga. 182, 184, 38 S.E. 314; McCandless v. Conley, 115 Ga. 48,41 S.E. 256), or to invoke a ruling as to whether the petition states a cause of action (Evans v. Josephine Mills,119 Ga. 448, 46 S.E. 674), but only brings up the question *Page 561 
whether the plaintiff proved his case as laid, without establishing such additional facts as disproved his right to recover (Duke v. Bibb Manufacturing Co., 120 Ga. 1074,18 S.E. 408); and since further, a nonsuit will be refused if there be even slight evidence to support the plaintiff's case (Barnett v. Terry, 42 Ga. 283 (3); Elrod v. McConnell,170 Ga. 892, 154 S.E. 449), we need not make inquiry as to whether or not the plaintiff's petition was defective, nor are we here concerned with any question of substantive law with respect to the subject-matter of the suit. Our duty is merely to examine the allegations of the petition and the proofs offered by plaintiff, and to compare the same in order to determine whether, on application of the principles hereinbefore referred to, the nonsuit should have been granted. In so doing, when the testimony of the plaintiff himself is being considered, there will be borne in mind the rule that if a plaintiff fails to establish the material allegations of his petition, or if his testimony is contradictory and uncertain as to such allegations, the court, on motion to nonsuit, should construe the evidence most strongly against him, and may, if no other testimony appears, be authorized to grant a nonsuit. Such was the full-bench decision in Ray v. Green, 113 Ga. 920 (39 S.E. 470), where it was also held that if the plaintiff introduce other witnesses whose testimony is sufficient to establish the allegations of his petition, it is error to grant a nonsuit.
A summary of the allegations of the petition and of the evidence appears in the preceding statement of facts. By a comparison of the one with the other, it must be held, on application of the principles hereinbefore referred to, that it was erroneous to grant a nonsuit. The indefiniteness in the testimony as to the terms of the contract was not more so than the allegations. That Clark was carried on the records as an employee, that social-security payments were deducted from what otherwise would have gone to him, that he included in no income-tax returns anything representing his interest in the enterprise, that he gave in the property for taxes as belonging to Bandy, that in answering garnishments directed to the concern he answered that he was agent for the garnishee, were not in themselves sufficient necessarily to break down the other portions of the plaintiff's testimony. Taking his testimony as a whole, certain statements appearing in the depositions of the defendant, the defendant's reference to the partnership, contained *Page 562 
in his letter of October 21, 1940, and the testimony of the witness Windham as to conversations with Bandy, the proofs were sufficient to withstand the motion for nonsuit.
While it has often been held that a nonsuit is improper when the plaintiff proves his case as laid, and it is as equally well established under the Georgia decisions that the reversal of a nonsuit is not an adjudication that the plaintiff is entitled to recover, or that the petition states a cause of action, nevertheless, if the defendant calls in question the sufficiency of the petition by demurrer, as he has a right to do, and the court renders an erroneous decision holding that the petition sets forth a cause of action, when in truth it does not, and the defendant acquiesces in that decision, the defendant can not thereafter be heard to say that no cause of action was set forth.Kelly v. Strouse, supra. We have said this in passing, for the reason that the bill of exceptions in the instant case recites that on the call of the case for trial "the court overruled defendant's demurrer as amended," it not being stated whether the demurrer was general or special, or whether the ruling so made was before or after the petition was amended into its present form.
Judgment reversed. All the Justices concur.